**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| Plaintiff, | ) | |
| | ) | **No. 24 CR 242** |
| | ) | |
| vs. | ) | **Judge Lindsay C. Jenkins** |
| | ) | |
| **RAPHAEL HAMMOND,** | ) | |
| Defendant. | ) | |

<u>**DEFENDANT RAPHAEL HAMMOND'S SENTENCING MEMORANDUM**</u>

NOW COMES the defendant, **RAPHAEL HAMMOND,** by his attorney, **PATRICK E. BOYLE,** and submits this sentencing memorandum, and respectfully requests, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and the Supreme Court's opinions in *Gall v. United States*, 128 S. Ct. 586 (2007) and *Kimbrough v. United States*, 128 S.Ct 558 (2007), that this court impose a below guidelines sentence of 42 months imprisonment, a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing as set forth in 18 U.S.C. Section 3553(a)(2). In support of this sentencing request, Raphael Hammond offers the following:

## I.      INTRODUCTION

Raphael Hammond is a polite, respectful, and thoughtful 38-year-old man who is now prepared to be sentenced by this Court for his conviction under Count One of an indictment which charged Raphael of being a Felon in Possession of a Firearm, in violation of 18 U.S.C. Section 922(g)(1).   To his credit, Mr. Hammond accepted full responsibility for all of his charged criminal and relevant conduct and pled guilty pursuant to a written plea agreement, waiving his right to a jury trial.  Raphael recognizes his wrongdoing, is very remorseful and

knows that he has let himself and his family down. After he serves his sentence, Raphael is committed to getting back to work and supporting his family. Raphael hopes that when this Court considers all of the facts of his case, the appropriate law, the numerous support letters offered on his behalf, and the arguments made here and in open court, it will fashion and impose a reasonable sentence that reflects the seriousness of the offense, while still allowing Raphael to rejoin his family, obtain legitimate employment and continue on his path of faith, service to others and self-betterment.

## II.   ADVISORY GUIDELINE RANGE

As stated above, Mr. Hammond accepted full responsibility for his wrongdoing and pleaded guilty pursuant to a written plea agreement before this Court on April 8, 2025. The PSR concludes that the base offense level here is 20 because Raphael committed the offense of 922(g)(1) after sustaining one felony conviction of a controlled substance offence, specifically, delivery of a controlled substance in 2012. (PSR at para. 16). According to the PSR, this prior drug offense involved "less than 1 gram of cocaine." (PSR at para. 45). Mr. Hammond does not object to this. Mr. Hammond also agrees that the offense level is increased by four levels because his possession involved the aggravated discharge of the firearm. (PSR at para. 17). Because Mr. Hammond receives the benefit of full acceptance of responsibility, his offense level is reduced by three levels bringing it to an adjusted total of 21. (PSR at 25).

Mr. Hammond also agrees that his criminal history score is 9 and that establishes a criminal history category of IV. (PSR at para. 52). Consequently, Mr. Hammond agrees with Probation's conclusion that based "upon a total offense level of 21 and a criminal history category of IV, the guideline imprisonment range is 57 to 71 months." (PSR at para. 162).

However, a sentence below this advisory guideline range is called for here because of the unique circumstances of Raphael Hammond's life and all of the mitigating factors to be discussed below. All of these factors are highly relevant and must be considered pursuant to the current sentencing caselaw and Section 3553(a), many of which are not adequately taken into account by the advisory guideline range.

## III. THE LEGAL STANDARD: SENTENCING BELOW THE GUIDELINE RANGE POST-*BOOKER*

Even before the *Booker* decision and its progeny, it was abundantly clear that our jurisprudence suggests that one of the main goals of the sentencing factors is to consider each defendant appearing before the court as an individual. As the Supreme Court explained in *Koon v. United States*, 518 U.S. 81 (1996), there is a tradition in this country of crafting a sentence based on each individual to come before the court with that person's unique characteristics in mind:

> "[it] has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon*, 518 U.S. at 113.

The basis of this tradition is the notion that the "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") Thus, this Court should take into account much more than the offense when fashioning a unique sentence that is reasonable and appropriate here.

3

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court made the Sentencing Guidelines effectively advisory. As a consequence, the federal sentencing statute still "requires a sentencing court to consider Guideline ranges . . . but it permits the court to tailor the sentence in light of other statutory concerns as well . . ." *Booker*, 125 S.Ct. at 756-57. The Guidelines calculations are to be treated "as just one of a number of sentencing factors." *United States v. Ranum*, 353 F.Supp.2d 984, 985-87 (E.D.Wis.2005). The *Ranum* court rejected the notion that the Guidelines must be afforded heavy weight and concluded that "courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the Section 3553(a) factors." *Ranum*, 353 F.Supp.2d at 987-89. The Section 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed:
>> (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
>> (b) to afford adequate deterrence to criminal conduct;
>> (c)to protect the public from further crimes of the defendant;
>> (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the advisory guideline range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities, and
> (7) the need to provide restitution to any victims of the offense. *18 U.S.C. Section 3553(a).*

Most importantly, Section 3553(a) directs the court, after considering these factors, to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" sub-section (a)(2). *Id.* This is the so-called "parsimony provision," which requires

district courts to impose the minimum term required to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation of the defendant. *See*, *e.g.*, *United States v. Cull*, 446 F.Supp.2d 961, 963 (E.D. Wis 2006); see also *United States v. Ferguson*, 456 F.3d 660, 667 (6th Cir.2006) (stating that the parsimony provision serves as "the guidepost for sentencing decisions post-*Booker*). In *United States v. Gall*, 552 U.S. 38, 128 S.Ct. 586 (2007), the Supreme Court upheld a district court's sentence of probation despite the fact that the advisory guideline range for the defendant was 30 to 37 months and held that there is no rule that requires "extraordinary" circumstances to justify a sentence outside the guideline range.

## IV.   SECTION 3553(a) FACTORS & MITIGATION IN RAPHAEL HAMMOND'S CASE

### A. The nature and circumstances of the offense:

There is no dispute that the offense and the relevant conduct that Raphael Hammond committed and pled guilty to was very serious. Undersigned counsel will be prepared to address the nature of the offense at Raphael's sentencing hearing as he anticipates that will be the majority of the government's presentation. Undersigned counsel appreciates the thorough and detailed Government's Version of the Offense which was provided to Probation. It would also probably assist the Court if the relevant video footage of the offense could be played at the sentencing hearing because still pictures cannot capture the sudden, immediate and shocking nature of the offense.

What is most important for the Court to understand and appreciate is that Raphael Hammond had no desire or intent to be involved in any shooting on the day in question, May 5, 2024 and that fact seems to be respectfully misunderstood by the government and probation in

5

their sentencing recommendations. Raphael's and his three friends' only intention was to enjoy each other's company, have a drink and relax at an arcade and bowling alley. Raphael and his friends did notice a group of young people that seemed interested in them but there was never any confrontation between Raphael and this group. No words or threats were ever exchanged. In fact, one of Raphael's friends only alerted one of the members of the group they had left a cell phone on a video game.

The video surveillance evidence reveals that this group then left and laid in wait for Raphael and his friends to leave. It is chilling to watch the main shooter waiting in a car out in front preparing himself to attack Raphael. This was no prearranged, mutual shoot-out. It was a cold-blooded murder attempt on Raphael and the shooter did not care who else might have been in his line of fire.

Raphael can be seen calmly leaving the lobby while attempting to light a cigarette. Yes, Raphael was illegally possessing a firearm that night as what he believed to be a necessary form of self-protection (he has been previously shot on four occasions as is discussed below) but he is not brandishing a weapon as he exits. The young shooter exits his vehicle, seems to grab a young woman on the sidewalk to use as a human shield, and them immediately starts firing at Raphael at point-blank range. Raphael immediately turns and retreats back into the lobby. One of Raphael's friend is struck by the shooter and is lying bleeding from his wound in the lobby. Raphael, in the midst of this terror and chaos, decides his only option is to pull out his gun and fire back at the assailants as they are fleeing in a vehicle. With the benefit of hindsight Raphael knows that he should have just sought shelter in the lobby and not engaged with the shooter. But in that moment he thought it was necessary to protect himself, his friends and the other people

6

who had been on the sidewalk. He had no way of knowing that the brazen shooter would just stop on his own and flee without being confronted with force.

After the first group of assailants fled, Raphael thought it was over. But another assailant, who was captured on video surveillance, then shot at Raphael and his friend striking Raphael's other friend. It is logically and morally unfair to hold Raphael in any way responsible for the other shooter's actions or her injury. Again, Raphael did not engage with this other individual in any way and was not even aware of his presence. As of this writing, there is no indication that this group of shooters (it can be assumed that the 2nd shooter was part of the 1st group but was left on the scene when they fled) have ever been arrested or charged. Consequently, Raphael is the only participant who is being punished for their actions. Raphael stayed on the scene and flagged down Chicago Police Officers to report the incident and to try and get help for his injured friends. Raphael Hammond was interviewed by the responding officers, and he gave them his true name and phone number. Raphael then accompanied his friends to the hospital where they received treatment for their gunshot wounds. Raphael has always been available to be interviewed by C.P.D. or any one else who is investigating this incident as he obviously wants his assailants arrested and prosecuted.

Raphael has no objection to the forfeiture of the firearm recovered in this case. While recognizing the serious nature of his criminal conduct, Raphael only asks that this Court recognize that he was not the aggressor in this case, had zero intention of engaging in any shootout until he was shot at and in this moment of terror he thought his only option to protect himself and others was to fire back at the assailant. He deeply regrets this snap decision and is thankful that he did not injure anyone that night.

**B. The history and characteristics of Raphael Hammond:**

Section 3553(a)(1) appropriately counsels that the offending conduct be considered in conjunction with the history and characteristics of the defendant. 18 U.S.C. Section 3553(a)(1). One must view the defendant's role in the offense and try to understand them as a person, evaluating their criminal conduct vis-a'-vis their background and their resultant mental state.

While it is true that the offense conduct in this case is serious in that it involves a felon possessing and discharging a firearm, it is also true that Raphael accepted full responsibility for his charged and relevant conduct in a written plea agreement demonstrating true remorse and a desire to never be involved in any criminal conduct in the future. Further, the extraordinarily difficult circumstances of his youth, including being a victim of multiple shootings and the resultant trauma, and his fragile and depressed untreated mental state as described in the PSR, does not excuse his criminal conduct but it does provide crucial context that this Court must consider when fashioning an appropriate sentence.

Raphael Leroy Hammond, who is now 38 years old, was born on March 5, 1987, in the Cabrini Green housing projects in Chicago to a single mother. (PSR at para. 117). Before he was even born, Raphael's father Raphael Orr was stabbed to death[1]. *Id.* Consequently, Raphael's pregnant mother faced the most extreme trauma and Raphael was born into a traumatized, depressed family. His mother could not help but be re-traumatized every time she saw Raphael and would immediately think of his murdered father. His mother was coping and

---

[1]For these early events in Raphael's life, counsel is relying on Raphael's best recollections which are reflected in the PSR. Family members have provided support letters that unsurprisingly have different memories of certain dates regarding these tragic events of over 30 years ago.

self-medicating by using heroin and had become addicted to daily injections of heroin.
Raphael's mother, Lisa Hammond, was the sole care giver for him and his three siblings –
Mario, Tiffany and Roy.

In 1990, Raphael's mother gave birth to another child, Lisa. Raphael's mother was HIV-positive and Lisa was born HIV-positive. "According to the defendant, she had been born addicted to heroin and contracted HIV through *in untero* transmission." *Id.* Raphael and his siblings were essentially homeless, receiving little or no care or supervision from their mother. At the age of four (4), Raphael suffered sever burns to his face when he and his older brother were playing with firecrackers, resulting in a seven-month hospital stay. PSR at para. 119. In other words, Raphael, as a four-year-old child was living alone in a hospital with severe burns with little or no support from his mother. The negative consequences of that pain and abandonment is obvious but difficult to quantify. Because of this obvious neglect, Raphael was removed from the custody of his mother by the Illinois Department of Children and Family Services. *Id.*

One year later, his mother – suffering from HIV – died. She was only 32 years old and Raphael was only 5. That same year, Raphael's two-year-old sister Lisa also died, from HIV-related complications. Consequently, at only 5 years old, Raphael had suffered the most consequential tragedies any person dreads to suffer – the loss of their parents and or a sibling.[2] Research shows that childhood trauma makes emotional parts of the brain that react to threats

---

[2]Tragically, Raphael has now also lost a child. His 18-year-old son Steven Raphael Hammond was murdered in Chicago on September 26, 2025. Because he was in custody, Raphael could not attend his son's funeral. This has been devastating for him. Steven provided a support letter for his dad and it is attached.

more reactive and disconnected from regulatory areas of the brain. These neural changes are implicated in both the negative outcome associated with childhood abuse and trauma and cognitive functions which are also closely linked to these negative outcomes.

Already in DCFS custody, Raphael was adopted by his cousin, Antonia Hammond, and her immediate family. Raphael's siblings were taken in and cared for by other family members in the Chicago area and in California which was a blessing but the separation from his siblings was also very difficult for Raphael and he did not see them again for years.

Though he was loved and supported by his adoptive family, Raphael – in an effort to numb the pain of his childhood – began abusing drugs and alcohol by the time he entered high school. While a student at Nicholas Senn High School in Chicago's Edgewater neighborhood, Raphael joined the Black P Stones street gang, finding kinship with other young men who came from similar, tragedy laden and dysfunctional backgrounds. As a student Raphael had to pass through rival gang territory on his way to school, so verbal and physical fights were frequent. After falling in with "the wrong crowd," and due to the difficulty of making it to school without confrontation, Raphael dropped out of high school in 10th grade. (PSR at para. 150). One year later, he left home and started "running the streets," living homeless or with friends until the age of 17. (PSR at para. 121). Because of this, Raphael was introduced to the criminal justice system at a very early age getting arrested for crimes such as loitering, cannabis possession, traffic offenses, trespassing, gambling and solicitation of unlawful business (street-level drug sales).

Raphael's disconnection from his extended family who had taken him in, though "voluntary," was quite literally an attempt to outrun his traumatic past. Every person in his life

was a grieving survivor who was a constant reminder of the loss and trauma that Raphael had suffered as a child. As he tried to escape and temporarily forget his loss, Raphael threw himself into the same cycle that resulted in the untimely deaths of his parents. Besides his alcohol and drug use, Raphael also survived a stabbing and *four* shootings. He has now survived another shooting where he miraculously was not killed on May 5, 2024. Not only have these incidents left significant literal scars on his body, but he also suffers significant chronic pain as a result of the shootings.

> "The defendant reported that he was stabbed in 2002 and shot in 2015, 2016, 2017, and 2018. As a result, Defendant Hammond has significant scars from bullet entry and exit wounds on his back, his right arm, the right side of his chest, his stomach, and his legs." (PSR at para. 133).

To date, a bullet remains lodged in his stomach, sporadically causing him abdominal pain. *Id*. His physical discomfort is further compounded by a history of chronic migraine headaches. In an effort to treat these symptoms over the years, Raphael has used marijuana and alcohol to self-medicate.

> "The defendant indicated that drug and alcohol use have caused him to be distant from people in his life. He reported his substance abuse has been triggered by symptoms of depression, and when he feels that he is not in control of a situation. To avoid triggers in the future, the defendant indicated that he is trying to better understand himself." (PSR at para. 148).

But of course, beyond the physical scars and pain, the much more serious and relevant issue here is the deep mental effects this life of trauma and pain has made on Raphael Hammond. This is directly relevant to the criminal offense here and what this Court has to consider in sentencing Raphael.

Undersigned counsel has done online research in an attempt to understand the neurochemical and physiological changes that occur when someone is shot at or actually shot by

11

a firearm. Below is a summary drawn from sources such as Harvard Health Publishing and other credible sources:

> "When a person is shot at, the brain initiates an immediate, intense stress response known a 'fight, flight, or freeze.' This reaction is triggered instantly by the amygdala, the brain's emotional processing center, and prepares the body for survival even before conscious thought can register the event. This cascade of neurochemical and physiological changes can temporarily enhance survival but may also have severe and long-lasting effects on mental health."

> "All of these changes happen so quickly that people aren't aware of them. In fact, the wiring is so efficient that the amygdala and hypothalamus start this cascade even before the brain's visual centers have had a chance to fully process what is happening. That's why people are able to jump out of the path of an oncoming car even before they think about what they are doing."

Raphael has actually been shot four times and has survived. This case began when someone shockingly walked right up to Raphael and shot at him multiple times from close range in a clear attempt to murder him. Raphael's immediate response to this – he first fled by turning and going back into the lobby – helped miraculously helped save his life – but his next immediate decisions – to draw a firearm and to "fight" back by shooting at his assailants is why Raphael stands before this Court now for sentencing. Raphael certainly regrets his decision to fire that weapon at his assailant and he knows that could have resulted in others being harmed but at that moment he thought it was absolutely necessary to protect himself, his friends (one of whom had already been shot and was lying bleeding in the lobby) and others. In retrospect Raphael knows that he should have just continued fleeing and sought shelter in the lobby instead of shooting at his assailants.

It is also relevant here to summarize what medical research has shown are the long-term impacts of being a gunshot survivor as Raphael is and was when he was again shot at on May 5, 2024:

"After the immediate threat is gone, the parasympathetic nervous system tries to calm the body, but the brain can continue to be impacted for weeks, months, or even years. If the survival response remains turned on, a person can continue to experience hyper vigilance and anxiety long after the event. For many survivors, the extreme stress can cause long-term, structural changes in the brain. This is especially common for those who develop post-traumatic stress disorder. (PTSD). Consequently, the brain's 'fear center' can become overactive causing a person to have an exaggerated fear response to even non-threatening stimuli. Reduced activity in the prefrontal cortex, which normally regulates the amygdala, impairs a person's ability to control their fear response. Survivors often experience intense emotional and behavioral struggles, including depress, survivor's guilt, anger, and avoidance of anything that reminds them of the event." See, *Understanding the Stress Response*, Harvard Health Publishing, April 3, 2024. See also, *How Does Trauma Affect Decision Making,* Centre for Clinical Psychology attached as an exhibit.

Based on this long history of tragedy and trauma there can be little question that Raphael suffers from P.T.S.D. The PSR notes that the "defendant has not been diagnosed with depression" and "that he has not undergone any psychiatric or psychological testing or evaluation." (PSR at para. 138-139). The absence of any real mental health treatment going back to Raphael's childhood is unfortunate. Further when Raphael was a victim of a stabbing and shootings he would just be patched up in an emergency room and sent on his way without receiving any mental health treatment. The PSR notes:

"With respect to his current mental health status, Defendant Hammond stated that he is feeling depressed because he feels like he has let everyone down and he 'keeps going through the same stuff.' The defendant stated that he is coping by reading. The defendant identified his girlfriend and several friends as his primary support group." (PSR at para. 138).

Any sentence here should require that Raphael receive mental health evaluations and counseling to help him deal with a lifetime of loss and trauma and to better equip him to face adversity going forward in his life.

Fortunately, Raphael has been blessed to have a long-term girlfriend in the person of

Kajhdia Lee since 2014 and she is also the mother of his children. The PSR notes:

> "According to Kajhdia, she and the defendant have a 'good' relationship, but they have ups and downs. In addition, she stated that the defendant is a good father and has always been there to support his children. Kajhdia indicated that the defendant's children have been suffering due to the defendant being in custody for the instant offense." (PSR at para. 127).

Ms. Lee has provided an extremely supportive and heartfelt letter on Raphael's behalf which is attached. Raphael has children that he cares for very deeply and is desperate to be back in their lives supporting them. The children have all provided support letters for their father and they are also attached. Again, Raphael's 18-year-old son Steven was recently murdered. Raphael is still processing this horrible tragedy. His regret at not being there for his son or to even be able to attend his funeral is something that he will carry and grieve forever.

Raphael just wants to serve his time and to be reunited with his family and support his children. The PSR notes that:

> "Prior to his arrest for the instant offense, the defendant was employed by JCW & JDW in Chicago. The defendant indicated that he began working at this employment in approximately October 2022 and was employed as a cargo deliverer through HG Cargo Services, LLC. The defendant stated that he was working five days per week, eight hours per day, and was earning $17.50 an hour. He provided pay stubs to his former United States Probation Officer as verification in December 2022 and October 2023." (PSR at para. 154).

With regard to Raphael's steady employment while on supervised release, this factor also weighs heavily in favor of a sentence below the advisory guideline range of imprisonment. The Commission's studies demonstrate that stable employment in the year prior to arrest is associated with a lower risk of recidivism. *See, Measuring Recidivism, supra,* at 12. The Guidelines fail to consider if a defendant facing sentencing is employed. However, that fact is extremely important. Being gainfully employed, as Raphael was, demonstrates that a defendant

14

is responsible and is not engaged in criminality as a livelihood. It is also a strong predictor that a defendant will not be a recidivist. Further, Raphael has obtained his General Educational Development (GED) certificate. (PSR at para. 151).

### C. The Need to Avoid Sentencing Disparities While Recognizing Racial Disparities in Sentencing

Raphael Hammond's race cannot be ignored when considering a sentence which is sufficient, but not greater than necessary to accomplish the goals of sentencing. Black male offenders continue to receive sentences that are approximately 20% higher than similarly situated white male offenders. U.S. Sentencing Commission, *Demographic Differences in Sentencing: An Update to the 2012 Booker Report* (2017).

The government's and probation's sentencing recommendations both cite Mr. Hammond's criminal history as an aggravating factor. In this case, the fact that Raphael had a prior drug conviction automatically raised the base offense level from 14 to 20, the fact that the firearm was discharged raised it an additional four levels to 24, and his criminal history also obviously raises the advisory guideline range so aggravating factors and criminal history are already "baked in" the advisory guideline range here. Further, the recommendations fail to consider two important and intertwined factors: the "adultification" of African American children and the over-policing of African American communities. An understanding of Raphael's criminal history is incomplete unless it is also discussed through the lens of his race.

Raphael Hammond was born to a single drug-addicted mother in the Chicago Cabrini Green housing projects. Consequently, Raphael grew up in an African American community that was inundated with a disproportionate number of Chicago Police officers fighting the "war on drugs," using the "broken windows" theory of policing. Petty offenses, like loitering,

15

trespassing, obstruction of traffic, traffic offenses, soliciting unlawful business and cannabis possession were treated as custodial arrests that resulted in young defendants being put in jail cells and brought to court. This invariably begins a cycle of arrests and the creation of a lengthy criminal history for behavior that is not particularly serious, especially in teens and young adults.

Raphael Hammond's juvenile and early adult armets are a textbook example of the adultification of a black child in Chicago. As discussed above, from an early age, Raphael was swept into the criminal justice system, not always for serious offenses, but more commonly for possessing cannabis, trespassing, loitering, traffic offenses and for solicitation of unlawful business. Significantly, none of Raphael's prior convictions involve violence. The effects of adultification of African American young men is that they are more likely to come into contact with the police at a young age and face harsher penalties than their white peers. See, American Psychological Association, *Black Boys Viewed as Older, Less Innocent than Whites, Research Finds* (Mar. 6, 2014). Raphael should not be held to a standard that is being abandoned in the face of evidence that African American men have been unfairly punished as if they were adults.

This Court should be satisfied that the requested sentence of 42 months imprisonment provides sufficient punishment for the crimes of the defendant and no additional time in custody is required to satisfy the goals of sentencing. It is everyone's interest now that Raphael receive the necessary mental health treatment and counseling and return to honest steady employment so that he can support his children. Raphael does not object to Probation's recommended conditions to his period of supervised release as discussed in pages 29 to 35 of the PSR or that he receive the maximum term of three years as recommended.

16

**WHEREFORE**, Defendant Raphael Hammond respectfully requests that this Court exercise its discretion, consider all of the relevant factors of 18 U.S.C. Section 3553(a), the support letters from his family, and all of the arguments made here and in open court, and sentence him to 42 months imprisonment followed by three years of supervised release with any and all reasonable conditions. Such a sentence would satisfy the mandate that the Court impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in sub-section *18 U.S.S.C. Section 3553(a).*

Respectfully submitted,

**RAPHAEL HAMMOND,**

By:s/ Patrick E. Boyle
His attorney Patrick E. Boyle

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave. Suite 562
Chicago, IL 60601
(312) 565-2888

17

## CERTIFICATE OF SERVICE

I, Patrick E. Boyle, an attorney, that on October 15, 2025, I electronically filed the foregoing **Defendant Raphael Hammond's Sentencing Memorandum** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electronic Case Filing (ECF).

By:     s/ Patrick E. Boyle
          PATRICK E. BOYLE